1
2
3
4

Michael R. Lozeau (State Bar No. 142893)
LOZEAU DRURY LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: Michael@lozeaudrury.com

5
6
7
8

Andrew L. Packard (State Bar No. 168690)
LAW OFFICES OF ANDREW L. PACKARD
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

9
10

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

11

12

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

13
14
15
16
17
18
19

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>TOMRA PACIFIC, INC., a corporation.<br><br>          Defendant. | Case No. C10-00701-BZ<br><br>**[~~PROPOSED~~] CONSENT DECREE** |

20
21
22
23
24
25
26
27
28

        **WHEREAS**, Plaintiff California Sportfishing Protection  (hereinafter "CSPA" or "Plaintiff") is a non-profit corporation dedicated to the protection, enhancement and restoration of waters of the State of California, including waters adjacent to urbanized areas of San Francisco Bay;

        **WHEREAS,** Defendant Tomra Pacific, Inc. ("Tomra") is a corporation organized under the laws of the State of Delaware;

        **WHEREAS**, Defendant operates a metal recycling facility located at 40595 Albrae Street in Fremont, California (the "Facility"), where Defendant engages in used beverage container ("UBC") collection, storage, sorting, and processing of aluminum, glass and plastic, and related activities;

1    **WHEREAS**, Defendant discharges storm water at the Facility pursuant to State Water

2    Resources Control Board Water Quality Order No. 97-03-DWQ, National Pollutant Discharge

3    Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges

4    of Storm Water Associated with Industrial Activities Excluding Construction Activities (hereinafter,

5    the "General Permit").  The Facility is divided into two areas.  Persons drop off materials to be

6    recycled at the front of the Facility.  For purposes of this Consent Decree, this front area of the

7    Facility is referred to as the "Drop-Off Area."  The rear of the Facility includes storage, processing,

8    and shipping of recyclable materials.  For purposes of this Consent Decree, this rear area of the

9    Facility is referred to as the "Processing Area."  A map of the Facility is attached hereto as Exhibit 1

10   displaying the Processing Area and the Drop Off Area and their drainage features and is

11   incorporated by reference;

12   **WHEREAS**, on or about November 20, 2009, CSPA served Defendant, the United States

13   Attorney General, the national and Region IX offices of the United States Environmental Protection

14   Agency, the State Water Resources Control Board ("State Board") and the Regional Water Quality

15   Control Board – San Francisco Bay Region ("Regional Board") with a Notice of Violation and

16   Intent to File Suit ("60-Day Notice") under Sections 505(a)(1) and (f) of the Federal Water Pollution

17   Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365(a)(1) and (f);

18   **WHEREAS,** the 60-Day Notice alleged that Defendant has violated and continues to violate

19   Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. § 1311(a) and 1342(p), due to

20   discharges of polluted storm water from the Facility in violation of the General Permit;

21   **WHEREAS**, on February 18, 2010, CSPA filed a complaint against Defendant in the United

22   States District Court for the Northern District of California, entitled *California Sportfishing*

23   *Protection Alliance v. Tomra Pacific, Inc.,* (Case No. C10-00701-BZ) (hereinafter "Complaint" or

24   "Action").  A true and correct copy of the Complaint as well as the 60-Day Notice is attached hereto

25   as Exhibit 2;

26   **WHEREAS**, CSPA and Defendant (hereinafter, collectively referred to as the "Settling

27   Parties") have agreed that it is in the parties' mutual interest to enter into a Consent Decree setting

forth terms and conditions appropriate to resolving the allegations set forth in the Complaint without further proceedings;

**WHEREAS**, after agreement of the parties to this proposed Consent Decree, the proposed Consent Decree will be submitted to the United States Department of Justice and the national and Region IX offices of the United States Environmental Protection Agency for the statutory review period pursuant to 33 U.S.C. § 1365(c) at least 45 days prior to the submittal of this Consent Decree to the Court for entry;

**WHEREAS**, all actions taken by the Settling Parties pursuant to this Consent Decree shall be taken in compliance with all applicable federal, state and local rules and regulations;

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1.      TOMRA agrees, to the extent it has not already done so, to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act and any amendments thereto.

2.      In order to prevent storm water from coming into contact with contaminants at the Facility and/or to prevent the discharge of waste or contaminated storm water from the Facility into the waters of the State and of the United States, Tomra shall implement additional and/or different structural and non-structural best management practices ("BMPs") as described more fully below. Tomra shall maintain or cause its tenant operating within the Processing Area to maintain all structural BMPs at the site in good operating condition.

**IMPROVEMENTS TO THE FACILITY'S**

**STORM WATER POLLUTION CONTROL MEASURES**

3.      Not later than October 1, 2011, Tomra Pacific agrees to install an appropriately sized and configured Stormwater Rx unit at the 40595 Albrae Street facility designed to treat substantially all stormwater flowing off the Processing Area of the facility.

4.      By not later than October 1, 2011, Tomra may develop and install an alternative

storm water control or treatment system that achieves equivalent or better storm water pollution reductions (including for example, no discharge) than the Stormwater Rx unit subject to CSPA's review and written concurrence, which shall not be unreasonably withheld.  If Tomra intends to proceed with such an alternative treatment system, Tomra shall notify CSPA as soon as possible but not later than July 1, 2011.  By that date, Tomra shall provide CSPA with all information gathered by Tomra to investigate the alternative storm water control or treatment system.  CSPA shall have 60-days to review any alternative storm water control or treatment system proposed by Tomra.  If CSPA, in good faith, does not believe that an alternative system proposed by Tomra Pacific will achieve equivalent or better storm water pollution reductions at the facility, Tomra Pacific must install the Stormwater Rx unit.

5.    The parties agree to meet and confer in good faith on any alternative proposal.  If CSPA objects to any alternative storm water control or treatment system or component or implementation thereof proposed by Tomra, at the request of either Settling Party, the Settling Parties shall in good faith seek to mediate any dispute well in advance of the deadline.

6.    As of October 1, 2011, Tomra Pacific agrees that any discharge of storm water from the rear of the facility shall strictly comply with EPA's Benchmark Values and all applicable water quality standards established by either the San Francisco Bay Regional Board or EPA.

7.    Tomra Pacific shall conduct heightened sweeping in the Facility's Drop-Off Area including but not limited to manually sweeping the area on a daily basis; hand-vacuuming the area before each forecast rain event during the rainy season, and mechanical sweeping of the area using a regenerative sweeper at least once per week during the wet season (October through May) and every other week during the dry season (June through September).

8.    Not later than November 15, 2010, Tomra shall install filters in each of the drop inlets located in the Drop-Off Area conforming to the specifications set forth in Exhibit 3.  To the extent such filters do not reduce pollutants in the Facility's storm water to levels below the Levels of Concern set forth in Paragraph 17, Tomra shall implement additional filtering or other management measures consistent with Paragraphs 18 through 22 below.

## SAMPLING, MONITORING, INSPECTION AND REPORTING

9.      In addition to, or in conformance with, any recordation, sampling, monitoring or inspecting activities described above, or otherwise required by law, Tomra agrees to perform the additional monitoring described herein during the 2010-2011, 2011-2012 and 2012-2013 wet seasons (October 1 – May 30, each year):

10.      During the 2011-2012 and 2012-2013 wet seasons, Tomra agrees to sample the treated storm water from the Facility's Processing Area during four qualifying storm events during each wet season.  If no discharges occur or less than four qualifying events as defined by the General Permit resulting in discharge occur, then the number of sampling events would be reduced accordingly for that wet season.  If the analytical results for all of the 2011-2012 storm water samples show that a specific parameter was discharged from the Process Area below the Levels of Concern set forth at Paragraph 17, analysis of that parameter may be reduced to two samples in the subsequent wet season (2012-2013).

11.      Tomra shall continue to sample storm water from the Drop-Off Area at the locations indicated on the map attached hereto as Exhibit 1.  Tomra shall sample storm water discharged from the Processing Area at a location downstream of all implemented stormwater management measures and prior to discharging or commingling with any water from the municipal storm drain or other sources.  Tomra shall analyze each storm water sample taken from the monitoring locations in accordance with the General Permit and this Agreement for, at a minimum, the following constituents:  total suspended solids, pH, oil and grease, specific conductance, chemical oxygen demand, aluminum, zinc, copper, and lead.  In addition to the General Permit's sample analysis requirements, Tomra agrees to analyze all samples for both total and dissolved metals as well as hardness.

12.      All samples collected from the Facility shall be delivered to a California state accredited environmental laboratory and shall be analyzed in accordance with the provisions of the General Permit.

13.      Analytical methods used by Tomra or its analytical laboratory shall be adequate to

detect the individual constituents at or below the Levels of Concern set forth in Paragraph 17.

14.     Results from Tomra's sampling and analysis shall be provided to CSPA within fourteen (14) days of receipt of the final written laboratory report from each sampling event.

15.     Tomra shall maintain logs of all sweeping activities at the Drop Off Area Facility, including the date and location of any sweeping, as part of the Facility's annual report

16.     Tomra shall maintain logs of maintenance and replacement activities pertaining to each of the storm water management measures installed or implemented at the Facility.  Such logs shall be maintained for each of the drop inlet filters installed at the Facility and maintenance activities associated with the Stormwater Rx unit or, if applicable, alternative storm water treatment system required by Paragraphs 3 and 4 above.  Such logs shall be included in the Facility's Annual Report.

## EXCEEDANCE OF LEVELS OF POTENTIAL CONCERN
### Storm Water Discharges from Processing Area

17.     Not later than October 1, 2011, Tomra shall not discharge storm water from the Processing Area in excess of the following Levels of Concern:  pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; chemical oxygen demand ("COD") – 120 mg/L; specific conductance – 200 μmho/cm;  aluminum – 0.75 mg/L (EPA Benchmark);  zinc – .117 mg/L (EPA Benchmark), 0.120 mg/L (Basin Plan Standard);  copper – .0636 mg/L (EPA Benchmark), 0.013 mg/L (Basin Plan Standard), lead – 0.0816 (EPA Benchmark), 0.065 mg/L (Basin Plan Standard).

### Storm Water Discharges from Drop-Off Area

18.     If analytical results of storm water samples taken by Tomra during the 2010-2011, 2011-2012 and/or 2012-2103 wet season indicate that storm water discharges from the Facility's Drop-Off Area exceed the Levels of Concern set forth in Paragraph 17 above, Tomra agrees to take additional feasible measures aimed at reducing pollutants in the Facility's storm water discharged from the Drop-Off Area to levels at or below these levels.

19.     In furtherance of that objective, when one or more analytical results of storm water

samples taken by Tomra during the 2010-2011 and/or 2011-2012 wet season indicate that storm water discharges from the Facility's Drop-Off Area exceed the Levels of Concern, Tomra shall prepare a written statement ("Memorandum") discussing:

> (1)   Any exceedance or exceedances of any Level of Concern;
>
> (2)   An explanation of the possible cause(s) and/or source(s) of any exceedance; and
>
> (3)   Additional feasible best management practices ("BMPs") that will be taken to further reduce the possibility of future exceedance(s).

20.    Such Memorandum shall be e-mailed and sent via first class mail to CSPA not later than July 30th following the conclusion of each wet season.  Any additional measures set forth in the Memorandum shall be implemented as soon as practicable, but not later than sixty (60) days from the due date of the Memorandum, except where 1) structural changes require longer than sixty (60) days to complete; 2) weather-related conditions render immediate implementation infeasible; or 3) the Settling Parties agree in writing to defer implementation of specific measures in order to effectively meet and confer in accordance with Paragraph 21.  Within thirty (30) days of implementation, Tomra's SWPPP shall be amended to include all additional BMP measures designated in the Memorandum.

21.    Upon receipt of the Memorandum, CSPA may review and comment on any additional measures.  If requested by CSPA within thirty (30) days of receipt of such Memorandum, CSPA and Tomra shall meet and confer and conduct a site inspection within ninety (90) days after the receipt of the Memorandum to discuss the contents of the Memorandum and the adequacy of proposed measures to improve the quality of the Facility's storm water discharged from the Drop-Off Area to levels at or below the Levels of Concern.  If within thirty (30) days of the parties meeting and conferring, the parties do not agree on the adequacy of the additional measures set forth in the Memorandum, the Settling Parties may agree to seek a settlement conference before the Mediator assigned to this action by the District Court pursuant to Paragraphs 30 through 32 below.  If the Settling Parties fail to reach agreement on additional measures, CSPA may bring a motion before the District Court Judge consistent with Paragraphs 29 through 30 below.  If CSPA does not

1    request a meet and confer regarding the Memorandum within the thirty (30) day comment period

2    provided for in this paragraph, CSPA shall waive any right to object to such Memorandum pursuant

3    to this Agreement.

4          22.     Any concurrence or failure to object by CSPA with regard to the reasonableness of

5    any additional measures required by this Agreement or implemented by Tomra shall not be deemed

6    to be an admission of the adequacy of such measures should they fail to bring the Facility's storm

7    water within the General Permit's best available technology requirements.

8          23.     In addition to any site inspections conducted as part of meeting and conferring on

9    additional measures set forth above, Tomra shall permit representatives of CSPA to perform up to

10   (2) site visits per year at the Facility during normal daylight business hours during the term of this

11   Agreement; provided that CSPA provides Tomra with at least one week prior notice via e-mail and

12   telephone using the contact information listed in Paragraph 42 below.

13         24.     Within thirty (30) days of the Effective Date of this Consent Decree, Tomra shall

14   amend the Facility Storm Water Pollution Prevention Plan ("SWPPP") to incorporate all changes,

15   improvements and best management practices set forth in this Consent Decree.  A copy of the

16   amended SWPPP shall be provided to CSPA within seven (7) business days of completion.

17         25.     During the life of this AGREEMENT, Tomra shall provide CSPA with a copy of all

18   documents submitted to the Regional Board or the State Board concerning the Facility's storm water

19   discharges, including but not limited to all documents and reports submitted to the Regional Board

20   and/or State Board as required by the General Permit.  Such documents and reports shall be mailed

21   to CSPA contemporaneously with submission to such agency.  Tomra also shall provide CSPA a

22   copy of all documents referenced in this agreement, including but not limited to logs or analyses,

23   within fourteen (14) days of a written request (via e-mail or regular mail) by CSPA.

24

25                          **MITIGATION FEES AND COSTS**

26         26.     As mitigation of the violations alleged in CSPA's Notice and Complaint, Tomra shall

27   pay the sum of Thirty-Five Thousand dollars ($35,000.00) (the "Payment") to the Rose Foundation

28   for Communities and the Environment ("Rose Foundation").  The Payment shall be conditioned on

the following:  (a) the Payment or any portion thereof shall not be disbursed or otherwise granted to CSPA or Tomra and (b) projects funded by the Payment shall be designed to benefit water quality in the San Francisco Bay or its tributaries.  Within fifteen (15) days of the Effective Date of the Consent Decree, Tomra shall make the Payment to the Rose Foundation.

27.     Tomra shall reimburse CSPA in the total amount of $40,000.00 to defray CSPA's investigation fees and costs, expert fees and costs, reasonable attorneys' fees, and all other costs incurred as a result of investigating the activities at the Facility, bringing these matters to Tomra's attention, and negotiating a resolution of this action in the public interest.  Such payment shall be made within fifteen (15) days of the Effective Date of the Consent Decree.  The payment shall be made out to "Lozeau Drury LLP Attorney-Client Trust Account."

28.     Tomra shall reimburse CSPA up to five thousand dollars ($5,000) per year for three years for reasonable costs and fees associated with monitoring Tomra's compliance with this Consent Decree and evaluating any alternative treatment method proposed by Tomra pursuant to Paragraph 4 above.  Monitoring activities include site inspections, review of water quality sampling reports, review of annual reports, discussion with representatives of Tomra concerning potential changes to compliance requirements, preparation and participation in meet and confer sessions and mediation, water quality sampling, etc.  Three (3) annual payments shall be made payable to the "Lozeau Drury LLP Attorney-Client Trust Account" within thirty (30) days of receipt of an invoice from CSPA which contains a daily and hourly description of fees and costs incurred by CSPA to monitor implementation of the Consent Decree during the previous twelve (12) months.

## DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

29.     The Effective Date shall be the date this Consent Decree is approved and entered by the Court.  The Consent Decree shall continue in effect until October 1, 2013.  This Court shall retain jurisdiction in this matter from the Effective Date through the date of its termination, for the purposes of enforcing the terms of this Consent Decree.  In addition, following the date of termination of this Decree, this Court shall retain jurisdiction for the purposes of enforcing this Decree for any disputes which arose prior to the termination of the Consent Decree.

30.     Except as specifically noted herein, any disputes with respect to any of the provisions of this Consent Decree shall be resolved through the following procedure.  The parties agree to first meet and confer to resolve any dispute arising under this Consent Decree.  The Parties shall meet and confer within fourteen (14) days of receiving written notification from the other Party of a request for a meeting to determine the merits of the dispute or whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the violation or dispute.  In the event that such disputes cannot be resolved through this meet and confer process or the Parties fail to meet and confer, the Parties agree to request a settlement meeting before David Roe, the Court-appointed mediator.  In the event that the Parties cannot resolve the dispute by the conclusion of the settlement meeting with the mediator, the Parties may submit the dispute via motion to the District Court Judge.  The prevailing party may seek recovery of reasonable attorney fees and costs incurred in bringing any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) or any other legal authority, and applicable case law interpreting such provisions.

31.     The Settling Parties agree that David Roe will serve as mediator for any future disputes subject to mediation pursuant to this Consent Decree.  In the event that Mr. Roe is not available for any requested mediation, the Settling Parties shall jointly select an alternative mediator.

32.     Tomra agrees to pay any and all fees and costs incurred or charged by the mediator to facilitate any mediation services provided for by this Consent Decree.

### MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

33.     In consideration of the above, and except as otherwise provided by this Consent Decree, the Settling Parties hereby forever and fully release each other and their respective successors, assigns, officers, agents, employees, and all persons, firms and corporations having an interest in them, from any and all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which the Settling Parties have against each other arising from CSPA's allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to and including the

1   Termination Date of this Consent Decree.

2       34.    The Settling Parties acknowledge that they are familiar with section 1542 of the

3   California Civil Code, which provides:

4           A general release does not extend to claims which the creditor does not know or suspect

5           to exist in his or her favor at the time of executing the release, which if known by him or

6           her must have materially affected his or her settlement with the debtor.

7   Except as otherwise provided by this Consent Decree, the Settling Parties hereby waive and

8   relinquish any rights or benefits they may have under California Civil Code section 1542 with

9   respect to any other claims against each other arising from, or related to, the allegations and claims

10  as set forth in the 60-Day Notice Letter and Complaint up to and including the Termination Date of

11  this Consent Decree.

12      35.    The Parties enter into this Consent Decree for the purpose of avoiding prolonged and

13  costly litigation.  Nothing in this Consent Decree shall be construed as, and Tomra expressly does

14  not intend to imply, any admission as to any fact, finding, issue of law, or violation of law, nor shall

15  compliance with this Consent Decree constitute or be construed as an admission by Tomra of any

16  fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not

17  diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this

18  Consent Decree.

19      36.    CSPA shall submit this Consent Decree to the U.S. EPA and the U.S. Department of

20  Justice (hereinafter, the "Agencies") via certified mail, return receipt requested, within five (5) days

21  after the Effective Date of this Consent Decree for review consistent with 40 C.F.R. § 135.5.  The

22  Agencies' review period expires forty-five (45) days after receipt of the Consent Decree by both

23  Agencies, as evidenced by the return receipts, copies of which shall be provided to Tomra upon

24  receipt by CSPA.  In the event that the Agencies comment negatively on the provisions of this

25  Consent Decree, CSPA and Tomra agree to meet and confer to attempt to resolve the issue(s) raised

26  by the Agencies.  If CSPA and Tomra are unable to resolve any issue(s) raised by the Agencies in

27  their comments, CSPA and Tomra agree to expeditiously seek a settlement conference with the

Court-appointed mediator to resolve the issue(s).

## MISCELLANEOUS PROVISIONS

37.     The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

38.     In the event that any of the provisions of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

39.     The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

40.     The undersigned are authorized to execute this Consent Decree on behalf of their respective parties and have read, understood and agreed to all of the terms and conditions of this Consent Decree.

41.     All agreements, covenants, representations and warranties, express or implied, oral or written, of the Settling Parties concerning the subject matter of this Consent Decree are contained herein.

42.     Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to CSPA pursuant to this Consent Decree shall be e-mailed and sent by U.S. Mail, postage prepaid, and addressed as follows:

> Bill Jennings, Executive Director
> California Sportfishing Protection Alliance
> 3536 Rainier Road
> Stockton, CA  95204
> deltakeep@aol.com

With copies sent to:

> Michael R. Lozeau
> Lozeau Drury LLP
> 1516 Oak Street, Suite 216
> Alameda, CA 94501
> michael@lozeaudrury.com

Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Tomra pursuant to this Consent Decree shall be sent by e-mail and U.S. Mail,

1    postage prepaid, and addressed as follows:

2            Tomra Pacific, Inc.
3            P.O. Drawer 1034
             Monticello, NY  12701
4            Attn:  Secretary

5    With copies sent to:

6            Ralph Robinson
             Wilson Elser Moskowitz Edelman & Dicker LLP
7            525 Market Street, 17th Floor
             San Francisco, California 94105
8            Ralph.robinson@wilsonelser.com

9            and

10           Walt Garigliano
11           P.O. Box 1034
             Monticello, NY 12701
12           Gariglianow.law@tomrana.com

13   Each party shall notify the other parties of any change in their contact information within 14 days of

14   any such change.

15           43.     Signatures of the Parties transmitted by facsimile or by e-mail shall be deemed

16   binding.

17           44.     No Party shall be considered to be in default in the performance of any of its

18   obligations when a failure to perform is due to a "Force Majeure." A Force Majeure event is any act

19   of God, war, fire, earthquake, flood, and restraint by court order or public authority.  A Force

20   Majeure event does not include normal inclement weather, such as anything less than or equal to a

21   100 year/24 hour storm event or inability to pay.  Any Party seeking to rely upon this paragraph

22   shall have the burden of establishing that it could not reasonably have been expected to avoid, and

23   which by exercise of due diligence has been unable to overcome, the Force Majeure.

24           45.     If for any reason the Court should decline to approve this Consent Decree in the form

25   presented, the Parties shall agree to work together to modify the Consent Decree within 30 days so

26   that it is acceptable to the Court.

27

28

[PROPOSED] CONSENT DECREE                          13                          Case No. C10-00701-BZ

1       46.    Nothing in this Consent Decree shall preclude Tomra from implementing protective

2   measures for storm water drainage in excess of the protections set forth herein.

3       47.    The Settling Parties hereto enter into this Consent Decree, Order and Final Judgment

4   and submit it to the Court for its approval and entry as a final judgment.

5

6   Dated: _10 December 2010_   Tomra Pacific, Inc.

7

8                       By: _Bill Jennings_

9

10  Dated: _____   California Sportfishing Protection Alliance

11

12                      By: _____

13                              Bill Jennings, Executive Director

14  **APPROVED AND SO ORDERED.**

15

16  Date: _____   _____

17                              UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

26

27

28

46.     Nothing in this Consent Decree shall preclude Tomra from implementing protective measures for storm water drainage in excess of the protections set forth herein.

47.     The Settling Parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.

Dated: __12/9/2010__                    Tomra Pacific, Inc.

                                        By: _____
                                            Phil Hoffman, Acting President

Dated: _____                  California Sportfishing Protection Alliance

                                        By: _____
                                            Bill Jennings, Executive Director

**APPROVED AND SO ORDERED.**

Date: _____           _____
                                UNITED STATES DISTRICT COURT JUDGE

1      46.     Nothing in this Consent Decree shall preclude Tomra from implementing protective

2 measures for storm water drainage in excess of the protections set forth herein.

3      47.     The Settling Parties hereto enter into this Consent Decree, Order and Final Judgment

4 and submit it to the Court for its approval and entry as a final judgment.

5

6 Dated: _____ Tomra Pacific, Inc.

7

8                                         By:     _____

9

10 Dated: _____ California Sportfishing Protection Alliance

11

12                                       By:     _____

13                                           Bill Jennings, Executive Director

14 **APPROVED AND SO ORDERED.**

15

16 Date: _____January 31, 2011_____    _____

17                                  UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

013847

# NOTICE OF INTENT
## SITE MAP



| MAP INFORMATION | STATE OF CALIFORNIA |
|---|---|
| | STATE WATER RESOURCES CONTROL BOARD |

TYPE ___UTILITY PLOT PLAN___

NUMBER ___Reynolds DWG #CC-98-401-959___

SCALE ___1" = 35'___

FACILITY  Fremont Recycling Plant
Reynolds Aluminum Recycling Co.

COUNTY  Div. of Reynolds Metals Company

Alameda

DATE  3/17/92     DRAWN  By: N.C.     CHECKED  N.C.

# EXHIBIT 1

# EXHIBIT 2

1   Michael R. Lozeau (State Bar No. 142893)
    David A. Zizmor (State Bar No. 255863)
2   LOZEAU DRURY LLP
    1516 Oak Street, Suite 216
3   Alameda, CA 94501
    Tel: (510) 749-9102
4   Fax: (510) 749-9103 (fax)
    E-mail: michael@lozeaudrury.com
5           david@lozeaudrury.com

6   Andrew L. Packard (State Bar No. 168690)
    LAW OFFICES OF ANDREW L. PACKARD
7   319 Pleasant Street
    Petaluma, CA 94952
8   Tel: (707) 763-7227
    Fax: (415) 763-9227
9   E-mail: andrew@packardlawoffices.com

10  Attorneys for Plaintiff
11  CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

12              **UNITED STATES DISTRICT COURT**   E-filing

13              **NORTHERN DISTRICT OF CALIFORNIA**

14  CALIFORNIA SPORTFISHING            Case No.   C10-00701  BZ
    PROTECTION ALLIANCE, a non-profit                        ADR
15  corporation,
                                       **COMPLAINT FOR DECLARATORY**
16          Plaintiff,                 **AND INJUNCTIVE RELIEF AND**
                                       **CIVIL PENALTIES**
17      vs.

18  TOMRA PACIFIC, INC., a corporation,   (Federal Water Pollution Control Act,
                                          33 U.S.C. §§ 1251 to 1387)
19          Defendant.

20

21          CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

22  counsel, hereby alleges:

23  **I.    JURISDICTION AND VENUE**

24          1.    This is a civil suit brought under the citizen suit enforcement provisions of the

25  Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or

26  "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter

27  of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28

28

COMPLAINT

1

EXHIBIT 2

U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On or about November 20, 2009, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

5.      Intradistrict assignment is proper in Oakland, California, pursuant to Local Rule 3-2(c), because the source of the violations is located within Alameda County.

## II.   **INTRODUCTION**

6.      This complaint seeks relief for Defendant's discharges of polluted storm water and non-storm water pollutants from Defendant TOMRA PACIFIC, INC.'s metal recycling facility located at 40595 Albrae Street in Fremont, California ("the Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No.

COMPLAINT

1  CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ,

2  as amended by Water Quality Order No. 97-03-DWQ (hereinafter "the Order" or "Permit"

3  or "General Permit").  Defendant's violations of the discharge, treatment technology,

4  monitoring, and other procedural and substantive requirements of the Permit and the Act are

5  ongoing and continuous.

6         7.      The failure on the part of persons and facilities such as Defendant and its

7  industrial facility to comply with storm water requirements is recognized as a significant

8  cause of the continued decline in water quality of San Francisco Bay and other area

9  receiving waters.  The general consensus among regulatory agencies and water quality

10  specialists is that storm pollution amounts to more than half of the total pollution entering

11  the aquatic environment each year.  In most areas of Alameda County, storm water flows

12  completely untreated through storm drain systems or other channels directly to the waters of

13  the United States.

14  **III.**    **PARTIES**

15         8.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

16  ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

17  California with its main office in Stockton, California.  CSPA has approximately 2,000

18  members who live, recreate, and work in and around waters of the State of California,

19  including San Francisco Bay.  CSPA is dedicated to the preservation, protection, and defense

20  of the environment, the wildlife, and the natural resources of all waters of California.  To

21  further these goals, CSPA actively seeks federal and state agency implementation of the Act

22  and other laws and, where necessary, directly initiates enforcement actions on behalf of itself

23  and its members.

24         9.      Members of CSPA reside in and around San Francisco Bay and enjoy using

25  the Bay for recreation and other activities.  Members of CSPA use and enjoy the waters into

26  which Defendant has caused, is causing, and will continue to cause, pollutants to be

27  discharged.  Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch,

28  view wildlife, and engage in scientific study including monitoring activities, among other

COMPLAINT

3

1  things.  Defendant's discharges of pollutants threaten or impair each of those uses or

2  contribute to such threats and impairments.  Thus, the interests of CSPA's members have

3  been, are being, and will continue to be adversely affected by Defendant's failure to comply

4  with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to

5  Plaintiff caused by Defendant's activities.

6       10.     Continuing commission of the acts and omissions alleged above will irreparably

7  harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy

8  at law.

9       11.     Defendant TOMRA PACIFIC, INC. ("Tomra") is a corporation organized

10  under the laws of California.  Tomra operates a recycling facility in Fremont, California.

11  **IV.**    **STATUTORY BACKGROUND**

12       12.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

13  pollutant into waters of the United States, unless such discharge is in compliance with

14  various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

15  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

16  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

17       13.     Section 402(p) of the Act establishes a framework for regulating municipal and

18  industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States

19  with approved NPDES permit programs are authorized by Section 402(p) to regulate

20  industrial storm water discharges through individual permits issued to dischargers or through

21  the issuance of a single, statewide general permit applicable to all industrial storm water

22  dischargers.  33 U.S.C. § 1342(p).

23       14.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

24  U.S. EPA has authorized California's State Board to issue NPDES permits including general

25  NPDES permits in California.

26       15.     The State Board elected to issue a statewide general permit for industrial storm

27  water discharges.  The State Board issued the General Permit on or about November 19,

28  1991; modified the General Permit on or about September 17, 1992; and reissued the

COMPLAINT

General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

17.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in any Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

18.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

19.     EPA has established Parameter Benchmark Values as guidelines for

COMPLAINT

5

determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established Parameter Benchmark Values for the following parameters, among others: total suspended solids – 100 mg/L; oil & grease – 15 mg/L; pH – 6.0-9.0 s.u.; iron – 1.0 mg/L; copper – 0.0636 mg/L, zinc – 0.117 mg/L; chemical oxygen demand – 120 mg/L; and aluminum – 0.75 mg/L.  The State Board has also proposed a Benchmark Value for electrical conductance of 200 μmhos/cm.

20.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992 (Section A and Provision E(2)).  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the

Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

21.     Section C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).

22.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6). Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

23.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

24.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual

Report (Section B(4)).  Section B(4)(c) requires visual observation records to note, among other things, the date of each monthly observation.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled." Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, and total organic content or oil & grease, as well as certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code. Facilities that fall under SIC Code 5093 ("processing, reclaiming, and wholesale distribution of scrap and waste materials") are required to analyze their storm water discharge samples for total suspended solids, iron, lead, aluminum, copper, zinc, and chemical oxygen demand. Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample…facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

    25.    Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

COMPLAINT

26.     The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any dilution credits to be applied by dischargers.

27.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

28.     The Regional Board has established water quality standards for San Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred to as the Basin Plan.

29.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."  Basin Plan at 3.3.18.

30.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses."  *Id.* at 3.3.7.

31.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."  *Id.* at 3.3.21.

32.     The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."  *Id*. at 3.3.14.

33.     The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."  *Id.* at 3.3.12.

34.     The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor

1  raised above 8.5." *Id.* at 3.3.9.

2      35.    The Basin Plan establishes Marine Water Quality Objectives for zinc of 0.081

3  mg/L (4-day average) and 0.090 mg/L (1-hour average).  *Id.* at Table 3-3.  The EPA has

4  adopted saltwater numeric water quality standards for zinc of 0.090 mg/L (Criteria

5  Maximum Concentration – "CMC") and 0.081 mg/L (Criteria Continuous Concentration –

6  "CCC").  65 Fed. Reg. 31712 (May 18, 2000).

7      36.    The Basin Plan establishes Marine Water Quality Objectives for copper of

8  0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour average).  Basin Plan at Table 3-3.

9  The EPA has adopted saltwater numeric water quality standards for copper of 0.0031 mg/L

10  (CMC) and 0.0048 mg/L (CCC).  65 Fed. Reg. 31712 (May 18, 2000).

11      37.    The Basin Plan establishes Marine Water Quality Objectives for lead of 0.0081

12  mg/L (4-day average) and 0.21 mg/L (1-hour average).  Basin Plan at Table 3-3.  The EPA

13  has adopted saltwater numeric water quality standards for lead of 0.210 mg/L (CMC) and

14  0.0081 mg/L (CCC).  65 Fed. Reg. 31712 (May 18, 2000).

15  **V.    STATEMENT OF FACTS**

16      38.    Defendant Tomra operates a recycling facility located at 40595 Albrae Street

17  in Fremont, California.  The Facility receives, sorts, and processes a variety of products for

18  recycling.  The Facility falls within SIC Code 5093.  The Facility covers approximately

19  35,000 square feet, the majority of which is paved and used for transporting and storing

20  recyclable materials throughout the Facility.  On information and belief, Plaintiff alleges that

21  there is at least one large building located on the property.  On information and belief,

22  Plaintiff alleges that the receiving, sorting, and processing of recyclable materials occurs

23  both inside and outside of this building.  Recyclable materials are transported in and out of

24  this building for storage in the paved areas of the Facility.

25      39.    Defendant channels and collects storm water falling on the Facility through a

26  series of storm water drains that lead to at least six storm water outfalls.  Each outfall

27  collects storm water runoff from a particular area of the Facility.  The Facility's outfalls

28  discharge either to a channel adjacent to the Facility, which flows to the Bay, or to the City

COMPLAINT

1  of Fremont's storm drain system, which then flows to the Bay.

2      40.     On information and belief, Plaintiff alleges that the industrial activities at the

3  site include the receiving, sorting, and processing of recyclable materials.  Industrial

4  activities also include the outdoor handling, processing, and storage of these materials as

5  well as other materials used to process and clean them.

6      41.     Significant activities at the site take place outside and are exposed to rainfall.

7  These activities include the storage and movement of raw materials and finished products,

8  equipment used to clean and process the recyclable materials; the storage and use of vehicles

9  and equipment for handling the materials; and the storage, handling, and disposal of waste

10 materials.  Loading and delivery of raw materials and finished products occurs outside.

11 Trucks enter and exit the Facility directly from and to public roads.  These areas are exposed

12 to storm water and storm flows due to the lack of overhead coverage, berms, and other storm

13 water controls.

14     42.     Industrial equipment and vehicles are operated and stored at the Facility in

15 areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon

16 alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel

17 fuel, anti-freeze and hydraulic fluids that are exposed to storm water flows, and that such

18 equipment and vehicles track sediment and other contaminants throughout the Facility.

19     43.     Plaintiff is informed and believes, and thereupon alleges that the storm water

20 flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease,

21 and other pollutants as it flows toward the storm water drains.  Storm water and any

22 pollutants contained in that storm water entering the drains flows directly to the municipal

23 storm drain system.

24     44.     The management practices at the Facility are wholly inadequate to prevent the

25 sources of contamination described above from causing the discharge of pollutants to waters

26 of the United States.  The Facility lacks sufficient structural controls such as grading,

27 berming, roofing, containment, or drainage structures to prevent rainfall and storm water

28 flows from coming into contact with these and other exposed sources of contaminants.  The

COMPLAINT

1   Facility lacks sufficient structural controls to prevent the discharge of water once

2   contaminated.  The Facility lacks adequate storm water pollution treatment technologies to

3   treat storm water once contaminated.

4         45.   Since at least November 20, 2004, Defendant has taken samples or arranged

5   for samples to be taken of storm water discharges at the Facility.  The sample results were

6   reported in the Facility's annual reports submitted to the Regional Board.  Defendant Tomra

7   certified each of those annual reports pursuant to Sections A and C of the General Permit.

8         46.   Since at least November 20, 2004, the Facility has detected iron, copper, lead,

9   zinc, aluminum, total suspended solids, pH, oil and grease, chemical oxygen demand, and

10  electrical conductance in storm water discharged from the Facility.  Levels of these

11  pollutants detected in the Facility's storm water have been in excess of EPA's numeric

12  parameter benchmark values and the State Board's proposed value for electrical

13  conductance.  Levels of these pollutants detected in the Facility's storm water have been in

14  excess of water quality standards established in the Basin Plan.

15        47.   Since at least November 20, 2004, the Facility has observed oil and grease,

16  turbidity and cloudiness, floating material, and discoloration in storm water discharged from

17  the Facility in excess of the narrative water quality standards established in the Basin Plan.

18        48.   The following discharges on the following dates contained concentrations of

19  pollutants in excess of numeric or narrative water quality standards established in the Basin

20  Plan:

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Objective | Location (as identified by the Facility) |
|---|---|---|---|---|
| 1/21/2009 | Oil & Grease Sheen Observed | | Narrative | Drains #3 and #5 |
| 1/21/2009 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |

| | | | | |
|---|---|---|---|---|
| 12/20/2008 | Oil & Grease Sheen Observed | | Narrative | Drains #3, #5, and #6 |
| 12/20/2008 | Turbidity/Cloudiness Observed | | Narrative | Drains #3, #5, and #6 |
| 11/25/2008 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 11/25/2008 | Discoloration Observed | | Narrative | Drain #5 |
| 11/25/2008 | Copper | 0.064 mg/L | 0.0031 mg/L (4-day average) – Marine | Drain #5 |
| 11/25/2008 | Copper | 0.064 mg/L | 0.0048 mg/L (1-hour average) – Marine | Drain #5 |
| 11/25/2008 | Lead | 0.019 mg/L | 0.0081 mg/L (4-day average) – Marine | Drain #5 |
| 11/25/2008 | Zinc | 0.68 mg/L | 0.081 mg/L (4-day average) – Marine | Drain #5 |
| 11/25/2008 | Zinc | 0.68 mg/L | 0.09 mg/L (1-hour average) – Marine | Drain #5 |
| 10/30/2008 | Oil & Grease Sheen Observed | | Narrative | Drains #3 and #5 |
| 10/30/2008 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |
| 2/19/2008 | Oil & Grease Sheen Observed | | Narrative | Drains #3 and #5 |
| 2/19/2008 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |
| 1/25/2008 | Oil & Grease Sheen | | Narrative | Drain #5 |

COMPLAINT

13

| | | | | |
|---|---|---|---|---|
| | Observed | | | |
| 1/25/2008 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
| 1/25/2008 | Floating Material Observed | | Narrative | Drain #5 |
| 12/4/2007 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |
| 5/2/2007 | Turbidity/Cloudiness Observed | | Narrative | Drain #2 |
| 4/14/2007 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 4/14/2007 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
| 3/26/2007 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
| 3/26/2007 | Discoloration Observed | | Narrative | Drain #5 |
| 3/26/2007 | Copper | 0.06 mg/L | 0.0031 mg/L (4-day average) – Marine | Not Identified |
| 3/26/2007 | Copper | 0.06 mg/L | 0.0048 mg/L (1-hour average) – Marine | Not Identified |
| 3/26/2007 | Lead | 0.0091 mg/L | 0.0081 mg/L (4-day average) – Marine | Not Identified |
| 3/26/2007 | Zinc | 1.4 mg/L | 0.081 mg/L (4-day average) – Marine | Not Identified |
| 3/26/2007 | Zinc | 1.4 mg/L | 0.09 mg/L (1-hour average) – Marine | Not Identified |

| | | | | |
|---|---|---|---|---|
| 11/14/2006 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 11/14/2006 | Discoloration Observed | | Narrative | Drain #5 |
| 10/12/2006 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 10/12/2006 | Discoloration Observed | | Narrative | Drain #5 |
| 3/17/2006 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 3/17/2006 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
| 3/17/2006 | Floating Material Observed | | Narrative | Drain #5 |
| 3/17/2006 | Discoloration Observed | | Narrative | Drain #5 |
| 2/17/2006 | pH | 6.4 | 6.5 – 8.5 | Not Identified |
| 2/17/2006 | Copper | 0.021 mg/L | 0.0031 mg/L (4-day average) – Marine | Not Identified |
| 2/17/2006 | Copper | 0.021 mg/L | 0.0048 mg/L (1-hour average) – Marine | Not Identified |
| 2/17/2006 | Zinc | 0.12 mg/L | 0.081 mg/L (4-day average) – Marine | Not Identified |
| 2/17/2006 | Zinc | 0.12 mg/L | 0.09 mg/L (1-hour average) – Marine | Not Identified |
| 1/31/2006 | Oil & Grease Sheen | | Narrative | Drain #1 |

| | | | | |
|---|---|---|---|---|
| | Observed | | | |
| 1/31/2006 | Turbidity/Cloudiness Observed | | Narrative | Drain #1 |
| 12/30/2005 | Oil & Grease Sheen Observed | | Narrative | Drains #2, #3, and #5 |
| 12/30/2005 | Turbidity/Cloudiness Observed | | Narrative | Drains #2, #3, and #5 |
| 12/30/2005 | Floating Material Observed | | Narrative | Drains #2, #3, and #5 |
| 2/16/2005 | pH | 6.1 | 6.5 – 8.5 | Not Identified |
| 2/16/2005 | Copper | 0.074 mg/L | 0.0031 mg/L (4-day average) – Marine | Not Identified |
| 2/16/2005 | Copper | 0.074 mg/L | 0.0048 mg/L (1-hour average) – Marine | Not Identified |
| 2/16/2005 | Zinc | 0.12 mg/L | 0.081 mg/L (4-day average) – Marine | Not Identified |
| 2/16/2005 | Zinc | 0.12 mg/L | 0.09 mg/L (1-hour average) – Marine | Not Identified |
| 2/14/2005 | Oil & Grease Sheen Observed | | Narrative | Drain #1 |
| 2/14/2005 | Turbidity/Cloudiness Observed | | Narrative | Drain #1 |
| 12/27/2004 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 12/27/2004 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |

COMPLAINT

| 12/27/2004 | Copper | 0.03 mg/L | 0.0031 mg/L (4-day average) – Marine | Drain #5 |
|---|---|---|---|---|
| 12/27/2004 | Copper | 0.03 mg/L | 0.0048 mg/L (1-hour average) – Marine | Drain #5 |
| 12/27/2004 | Lead | 0.0086 mg/L | 0.0081 mg/L (4-day average) – Marine | Drain #5 |
| 12/27/2004 | Zinc | 0.36 mg/L | 0.081 mg/L (4-day average) – Marine | Drain #5 |
| 12/27/2004 | Zinc | 0.36 mg/L | 0.09 mg/L (1-hour average) – Marine | Drain #5 |
| 11/10/2004 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 11/10/2004 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |

49.     The levels of total suspended solids in storm water detected by the Facility have exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA.   The levels of total suspended solids in storm water detected by the Facility have exceeded the standard for suspended materials articulated in the Basin Plan.  For example, on November 25, 2008, the level of total suspended solids measured by Defendant in the Facility's discharged storm water was 304 mg/L.  That level of total suspended solids is over three times the benchmark value for total suspended solids established by EPA.  The Facility has also measured levels of total suspended solids in storm water discharged from the Facility in excess of EPA's benchmark value of 100 mg/L on March 26, 2007; February 17, 2006; and December 27, 2004.

50.     The levels of zinc in storm water detected by the Facility have exceeded the numeric standards for zinc established in the Basin Plan.  For example, on March 26, 2007, the level of zinc measured by Defendant in the Facility's discharged storm water was 1.4 mg/L.  That level of zinc is nearly seventeen times the 4-day average numeric water quality

COMPLAINT

standard of .081 mg/L for zinc established by the Regional Board in the Basin Plan.  That level of zinc is nearly sixteen times the 1-hour average numeric water quality standard of .081 mg/L for zinc established by the Regional Board in the Basin Plan.  The Facility has also measured levels of zinc in storm water discharged from the Facility in excess of the numeric water quality standards for zinc established in the Basin Plan on November 25, 2008; March 26, 2007; February 17, 2006; February 16, 2005; and December 27, 2004.

51.     The levels of zinc in storm water detected by the Facility have exceeded the benchmark value for zinc of 0.117 mg/L established by EPA.  For example, on March 26, 2007, the level of zinc measured by Defendant in the Facility's discharged storm water was 1.4 mg/L.  That level of zinc is nearly twelve times the benchmark value for zinc established by EPA.  The Facility has also measured levels of zinc in storm water discharged from the Facility in excess of EPA's benchmark value of 0.117 mg/L on November 25, 2008; February 17, 2006; February 16, 2005; and December 27, 2004.

52.     The levels of copper in storm water detected by the Facility have exceeded the numeric standards for copper established in the Basin Plan.  For example, on February 16, 2005, the level of copper measured by Defendant in the Facility's discharged storm water was 0.074 mg/L.  That level of copper is nearly 24 times the 4-day average numeric water quality standard of .0031 mg/L for copper established by the Regional Board in the Basin Plan.  That level of copper is greater than 15 times the 1-hour average numeric water quality standard of .0048 mg/L for copper established by the Regional Board in the Basin Plan.  The Facility has also measured levels of copper in storm water discharged from the Facility in excess of the numeric water quality standards for copper established in the Basin Plan on November 25, 2008; March 26, 2007; February 17, 2006; February 16, 2005; and December 27, 2004.

53.     The levels of copper in storm water detected by the Facility have been outside the benchmark value for copper of 0.0636 mg/L established by EPA.  For example, on February 16, 2005, the level of copper measured by Defendant in the Facility's discharged storm water was 0.074 mg/L.  The Facility also has measured levels of copper in storm water

discharged from the Facility outside of the EPA's benchmark value of 0.0636 mg/L on November 25, 2008; March 26, 2007; February 17, 2006; February 16, 2005; and December 27, 2004.

54.     The levels of lead in storm water detected by the Facility have exceeded the numeric standards for lead established in the Basin Plan.  For example, on February 16, 2005, the level of copper measured by Defendant in the Facility's discharged storm water was 0.019 mg/L.  That level of lead is more than double the 4-day average numeric water quality standard of .0081 mg/L for lead established by the Regional Board in the Basin Plan. The Facility has also measured levels of lead in storm water discharged from the Facility in excess of the numeric water quality standards for lead established in the Basin Plan on November 25, 2008; March 26, 2007; and December 27, 2004.

55.     The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on March 26, 2007, the level of aluminum measured by Defendant in the Facility's discharged storm water was 8.5 mg/L.  That level of aluminum is over eleven times the benchmark value for aluminum established by EPA.  The Facility has also measured levels of aluminum in storm water discharged from the Facility in excess of EPA's benchmark value of 0.75 mg/L on November 25, 2008; February 17, 2006; and December 27, 2004.

56.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value for iron of 1.0 mg/L established by EPA.  For example, on November 25, 2008, the level of iron measured by Defendant in the Facility's discharged storm water was 9.9 mg/L.  That level of iron is nearly ten times the benchmark value for iron established by EPA.  The Facility has also measured levels of iron in storm water discharged from the Facility in excess of EPA's benchmark value of 1.0 mg/L on March 26, 2007; February 17, 2006; and December 27, 2004.

57.     The electrical conductance levels detected by the Facility in its storm water have been greater than the numeric water quality standards applicable to electrical conductance in California.  The electrical conductance levels detected by the Facility in its

storm water have been greater than the benchmark value of 200 μmho/cm proposed by the State Board.  For example, on December 27, 2004, the electrical conductance level measured by Defendant in the Facility's discharged storm water was 220 μmho/cm.  The Facility also has measured levels of electrical conductance in storm water discharged from the Facility in excess of the proposed benchmark value of 200 μmho/cm on March 26, 2007.

58.     The levels of oil and grease in storm water detected by the Facility have exceeded the benchmark value for oil and grease of 15 mg/L established by EPA.  On February 17, 2006, the level of oil and grease measured by Defendant in the Facility's discharged storm water was 17 mg/L.

59.     The levels of chemical oxygen demand in storm water detected by the Facility have exceeded the benchmark value for chemical oxygen demand of 120 mg/L established by EPA.  On December 27, 2004, the level of chemical oxygen demand measured by Defendant in the Facility's discharged storm water was 640 mg/L.  That level of chemical oxygen demand is over five times the benchmark value for chemical oxygen demand established by EPA.

60.     On information and belief, Plaintiff alleges that since at least November 20, 2004, Defendant has failed to implement BAT and BCT at the Facility for its discharges of zinc, copper, lead, total suspended solids, aluminum, iron, electrical conductance, oil and grease, chemical oxygen demand, and other pollutants.  Section B(3) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

61.     On information and belief, Plaintiff alleges that since at least November 20, 2004, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an

COMPLAINT

adequate assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or an adequate description of best management practices to be implemented at the Facility to reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.

62.     Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to either a channel adjacent to the Facility, which flows to the Bay, or to the City of Fremont's storm drain system, which then flows to the Bay.

63.     On information and belief, Plaintiff alleges that Defendant has failed to collect the two required storm samples from each and every storm water discharge location at the Facility during each wet season since at least November 20, 2004.  Plaintiff is informed and believes, and thereupon alleges that Defendant failed to sample two storm events during each of the 2005-2006, 2006-2007, and 2008-2009 wet seasons; and failed to sample any storm events during the 2007-2008 wet season.  On information and belief, Plaintiff further alleges that during both the 2007-2008 and 2008-2009 wet seasons, Defendant sampled and analyzed storm water discharges from just one of the Facility's six outfalls; and during each of the 2004-2005, 2005-2006, and 2006-2007 wet seasons, Defendant sampled and analyzed storm water discharges from just one of the Facility's four outfalls.

64.     On information and belief, Plaintiff alleges that Defendant failed to make the required monthly visual observations at the Facility in January 2005, March 2005, February 2006, and April 2006.

65.     On information and belief, Plaintiff alleges that Defendant either failed to record mandatory observations or recorded no rainfall, and therefore no observations, in months during which rainfall occurred, at the Facility on sixteen separate occasions: in April,

May, October, and November of 2005; May and December of 2006; January, February, October, and November of 2007; March and April of 2008; and February, March, April, and May of 2009.

66.     On information and belief, Plaintiff alleges that Defendant failed to note the dates on its monthly visual observations in April, May, October, and November of 2005; May 2006; May 2008; and February, March, April, and May of 2009.

67.     Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

68.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least July 1, 2005.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

69.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

70.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

COMPLAINT

71.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of zinc, copper, lead, total suspended solids, aluminum, iron, pH, electrical conductance, oil and grease, chemical oxygen demand, and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

72.     Each day since November 20, 2004, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

73.     Defendant has been in violation of the BAT/BCT requirements every day since November 20, 2004.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311(a), 1342)

74.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

75.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

76.     Plaintiff is informed and believes, and thereupon alleges, that since at least November 20, 2004, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of

COMPLAINT

23

1   the General Permit.

2       77.     During every rain event, storm water flows freely over exposed materials, waste

3   products, and other accumulated pollutants at the Facility, becoming contaminated with

4   suspended solids, zinc, copper, lead, pH, oil and grease, and other unmonitored pollutants at

5   levels above applicable water quality standards.  The storm water then flows untreated from

6   the Facility into either a channel adjacent to the Facility or into the City of Fremont storm drain

7   system and then flows into the Bay.

8       78.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of

9   contaminated storm water are causing or contributing to the violation of the applicable water

10  quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional

11  Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

12      79.     Plaintiff is informed and believes, and thereupon alleges, that these discharges

13  of contaminated storm water are adversely affecting human health and the environment in

14  violation of Receiving Water Limitation C(1) of the General Permit.

15      80.     Every day since at least November 20, 2004, that Defendant has discharged and

16  continues to discharge polluted storm water from the Facility in violation of the General Permit

17  is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These

18  violations are ongoing and continuous.

19                          **THIRD CAUSE OF ACTION**
                    **Failure to Prepare, Implement, Review, and Update**
20                    **an Adequate Storm Water Pollution Prevention Plan**
                  **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
21
22      81.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully

23  set forth herein.

24      82.     Section A and Provision E of the General Permit requires dischargers of storm

25  water associated with industrial activity to develop and implement an adequate SWPPP no

26  later than October 1, 1992.

27      83.     Defendant has failed to develop and implement an adequate SWPPP for the

28  Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the

COMPLAINT

1   Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials without

2   appropriate best management practices; the continued exposure of significant quantities of

3   various materials to storm water flows; the continued exposure and tracking of waste resulting

4   from the operation or maintenance of vehicles at the site, including trucks; the failure to either

5   treat storm water prior to discharge or to implement effective containment practices; and the

6   continued discharge of storm water pollutants from the Facility at levels in excess of EPA

7   benchmark values.

8          84.    Defendant has failed to update the Facility's SWPPP in response to the

9   analytical results of the Facility's storm water monitoring.

10         85.    Each day since November 20, 2004, that Defendant has failed to develop,

11  implement and update an adequate SWPPP for the Facility is a separate and distinct violation

12  of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

13         86.    Defendant has been in violation of the SWPPP requirements every day since

14  November 20, 2004.  Defendant continues to be in violation of the SWPPP requirements each

15  day that it fails to develop and fully implement an adequate SWPPP for the Facility.

16                         **FOURTH CAUSE OF ACTION**
       **Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
17              **(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

18         87.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully

19  set forth herein.

20         88.    Section B of the General Permit requires dischargers of storm water associated

21  with industrial activity to have developed and be implementing a monitoring and reporting

22  program (including, *inter alia*, sampling and analysis of discharges) no later than October 1,

23  1992.

24         89.    Defendant has failed to develop and implement an adequate monitoring and

25  reporting program for the Facility.  Defendant's ongoing failure to develop and implement

26  an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to

27  sample two storm events per wet season.

28         90.    Each day since November 20, 2004, that Defendant has failed to develop and

COMPLAINT
                                        25

implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### FIFTH CAUSE OF ACTION
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

91.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

92.    Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least July 1, 2005.

93.    Each day since at least July 1, 2005 that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.   Order Defendant to comply with the Permit's monitoring and reporting

COMPLAINT

1  requirements, including ordering supplemental monitoring to compensate for past monitoring
2  violations;

3      f.  Order Defendant to prepare a SWPPP consistent with the Permit's
4  requirements and implement procedures to regularly review and update the SWPPP;

5      g.  Order Defendant to provide Plaintiff with reports documenting the quality
6  and quantity of their discharges to waters of the United States and their efforts to comply with
7  the Act and the Court's orders;

8      h.  Order Defendant to pay civil penalties of up to $37,500 per day per violation
9  for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§
10  1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

11      i.  Order Defendant to take appropriate actions to restore the quality of waters
12  impaired or adversely affected by their activities;

13      j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness,
14  compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

15      k.  Award any such other and further relief as this Court may deem appropriate.

16  Dated: February 18, 2010          Respectfully submitted,

17                                    LOZEAU DRURY LLP

18

19  By:  _Michael R. Lozeau_
                                      Michael R. Lozeau
20                                    Attorneys for Plaintiff
                                      CALIFORNIA SPORTFISHING PROTECTION
21                                    ALLIANCE

22

23

24

25

26

27

28

COMPLAINT
                                    27

# EXHIBIT A

# California Sportfishing Protection Alliance
*"An Advocate for Fisheries, Habitat and Water Quality"*
**3536 Rainier Avenue, Stockton, CA 95204**
**Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com**

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

November 20, 2009

Randall Gusikoski, President                     Mr. Scott Lamb, President
Francisco Minjavez                                    Tomra Pacific, Inc.
Tomra Pacific – Fremont Plant                   150 Klug Circle
40595 Albrae Street                                  Corona, CA 92880
Fremont, CA 94538

Mr. Greg Knoll, CEO-President
Tomra of North America
480 Lordship Boulevard
Stratford, CT 06615

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
          Pollution Control Act (Clean Water Act)**

Dear Messrs. Gusikoski, Minjavez, Knoll and Lamb:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at Tomra Pacific, Inc., located at 40595 Albrae Street in Fremont, California ("Facility"). CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay ("Bay") and other California waters. This letter is being sent to you as the responsible owner, officer, or operator of the Facility (all recipients are hereinafter collectively referred to as "Tomra Pacific").

This letter addresses Tomra Pacific's unlawful discharge of pollutants from the Facility into channels that flow into the Bay. The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit"). The Waste Discharge Identification Number ("WDID") for the Facility listed on documents submitted to the Regional Board is 201I013847. The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 2 of 15

Protection Agency ("EPA"), and the State in which the violations occur.

     As required by the Clean Water Act, this Notice of Violations and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, CSPA hereby places Tomra Pacific on formal notice that, after the expiration of sixty days from the date of this Notice of Violation and Intent to Sue, CSPA intends to file suit in federal court against Tomra Pacific, including the responsible owners, officers, or operators, under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)) for violations of the Clean Water Act and the General Permit.  These violations are described more extensively below.

## I.    Background.

     On March 19, 1998, Tomra Pacific filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). Tomra Pacific certified that the Facility is classified under SIC code 5093 ("processing, reclaiming, and wholesale distribution of scrap and waste materials").  The Facility collects and discharges storm water from its approximately 35,000 square foot industrial site into at least six storm water discharge locations at the Facility.  The storm water discharged by Tomra Pacific is discharged to the City of Fremont storm drain system which flows into San Francisco Bay.

     The Regional Board has identified beneficial uses of the Bay's waters and established water quality standards for San Francisco Bay as well its tributaries in the "Water Quality Control Plan for the San Francisco Bay Basin**,**" generally referred to as the Basin Plan.  *See* http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/basin_plan/docs/basin_plan07.pdf.  The beneficial uses of these waters include, among others, contact and non-contact recreation, fish migration, endangered and threatened species habitat, shellfish harvesting, and fish spawning.  The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features."  *Id.* at 2.1.16.  Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs peoples' use of San Francisco Bay for contact and non-contact water recreation.

     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."  *Id.* at 3.3.18.  The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses."  *Id.* at

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 3 of 15

3.3.7.  The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."  *Id*. at 3.3.21.  The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."  *Id*. at 3.3.14.  The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."  *Id.* at 3.3.12.  The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."  *Id.* at 3.3.9.

Both the Regional Board and EPA have established numeric water quality standards for pollutants discharged by Tomra Pacific that flow into San Francisco Bay.  The Basin Plan establishes Marine Water Quality Objectives for zinc of 0.081 mg/L (4-day average) and 0.090 mg/L (1-hour average); for copper of 0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour average); and for lead of 0.0081 mg/L (4-day average) and 0.21 mg/L (1-hour average).  *Id.* at Table 3-3.  The EPA has adopted saltwater numeric water quality standards for zinc of 0.090 mg/L (Criteria Maximum Concentration – "CMC") and 0.081 mg/L (Criteria Continuous Concentration – "CCC"); for copper of 0.0031 mg/L (CMC) and 0.0048 mg/L (CCC); and for lead of 0.210 mg/L (CMC) and 0.0081 mg/L (CCC).  65 Fed. Reg. 31712 (May 18, 2000).

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  65 Fed. Reg. 64767 (October 30, 2000).  The following benchmarks have been established for pollutants discharged by Tomra Pacific: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, oil and grease ("O&G") – 15 mg/L, iron – 1 mg/L, aluminum – 0.75 mg/L, copper – 0.0636 mg/L, zinc – 0.117 mg/L, and chemical oxygen demand ("COD") – 120 mg/L.  The State Water Quality Control Board also has proposed adding a benchmark level to the General Permit for specific conductance of 200 µmho/cm.

## II.     Alleged Violations of the NPDES Permit.

### A.     *Discharges in Violation of the Permit.*

Tomra Pacific has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit.  The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 4 of 15

("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or
nonconventional.  *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of
materials other than storm water (defined as non-storm water discharges) that discharge either
directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the General
Permit prohibits storm water discharges and authorized non-storm water discharges that cause or
threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits
storm water discharges and authorized non-storm water discharges to surface or groundwater
that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the
General Permit also prohibits storm water discharges and authorized non-storm water discharges
that cause or contribute to an exceedance of any applicable water quality standards contained in
a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  The
General Permit does not authorize the application of any mixing zones for complying with
Receiving Water Limitation C(2).  As a result, compliance with this provision is measured at the
Facility's discharge monitoring locations.

Tomra Pacific has discharged and continues to discharge storm water with unacceptable
levels of TSS, specific conductivity, iron, zinc, aluminum, copper, lead, chemical oxygen
demand ("COD"), and other pollutants in violation of the General Permit.  Tomra Pacific's
sampling and analysis results reported to the Regional Board confirm discharges of specific
pollutants and materials other than storm water in violation of the Permit provisions listed above.
Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a
permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have contained concentrations of
pollutants in excess of narrative and numeric water quality standards established in the Basin
Plan or promulgated by EPA and thus violated Discharge Prohibitions A(1) and A(2) and
Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent
Limitation B(3) of the General Industrial Storm Water Permit:

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Objective | Location (as identified by the Facility) |
|---|---|---|---|---|
| 1/21/2009 | Oil & Grease Sheen Observed | | Narrative | Drains #3 and #5 |
| 1/21/2009 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |
| 12/20/2008 | Oil & Grease Sheen Observed | | Narrative | Drains #3, #5, and #6 |
| 12/20/2008 | Turbidity/Cloudiness | | Narrative | Drains #3, #5, |

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 5 of 15

| | | | | |
|---|---|---|---|---|
| | Observed | | | and #6 |
| 11/25/2008 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 11/25/2008 | Discoloration Observed | | Narrative | Drain #5 |
| 11/25/2008 | Copper | 0.064 mg/L | 0.0031 mg/L (4-day average) – Marine | Drain #5 |
| 11/25/2008 | Copper | 0.064 mg/L | 0.0048 mg/L (1-hour average) – Marine | Drain #5 |
| 11/25/2008 | Lead | 0.019 mg/L | 0.0081 mg/L (4-day average) – Marine | Drain #5 |
| 11/25/2008 | Zinc | 0.68 mg/L | 0.081 mg/L (4-day average) – Marine | Drain #5 |
| 11/25/2008 | Zinc | 0.68 mg/L | 0.09 mg/L (1-hour average) – Marine | Drain #5 |
| 10/30/2008 | Oil & Grease Sheen Observed | | Narrative | Drains #3 and #5 |
| 10/30/2008 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |
| 2/19/2008 | Oil & Grease Sheen Observed | | Narrative | Drains #3 and #5 |
| 2/19/2008 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |
| 1/25/2008 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 1/25/2008 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
| 1/25/2008 | Floating Material Observed | | Narrative | Drain #5 |
| 12/4/2007 | Turbidity/Cloudiness Observed | | Narrative | Drains #3 and #5 |
| 5/2/2007 | Turbidity/Cloudiness Observed | | Narrative | Drain #2 |
| 4/14/2007 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 4/14/2007 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |

Notice of Violation and Intent to File Suit

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 6 of 15

| 3/26/2007 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
|---|---|---|---|---|
| 3/26/2007 | Discoloration Observed | | Narrative | Drain #5 |
| 3/26/2007 | Copper | 0.06 mg/L | 0.0031 mg/L (4-day average) – Marine | Not Identified |
| 3/26/2007 | Copper | 0.06 mg/L | 0.0048 mg/L (1-hour average) – Marine | Not Identified |
| 3/26/2007 | Lead | 0.0091 mg/L | 0.0081 mg/L (4-day average) – Marine | Not Identified |
| 3/26/2007 | Zinc | 1.4 mg/L | 0.081 mg/L (4-day average) – Marine | Not Identified |
| 3/26/2007 | Zinc | 1.4 mg/L | 0.09 mg/L (1-hour average) – Marine | Not Identified |
| 11/14/2006 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 11/14/2006 | Discoloration Observed | | Narrative | Drain #5 |
| 10/12/2006 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 10/12/2006 | Discoloration Observed | | Narrative | Drain #5 |
| 3/17/2006 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 3/17/2006 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
| 3/17/2006 | Floating Material Observed | | Narrative | Drain #5 |
| 3/17/2006 | Discoloration Observed | | Narrative | Drain #5 |
| 2/17/2006 | pH | 6.4 | 6.5 – 8.5 | Not Identified |
| 2/17/2006 | Copper | 0.021 mg/L | 0.0031 mg/L (4-day average) – Marine | Not Identified |
| 2/17/2006 | Copper | 0.021 mg/L | 0.0048 mg/L (1-hour average) – | Not Identified |

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 7 of 15

| | | | | |
|---|---|---|---|---|
| | | | Marine | |
| 2/17/2006 | Zinc | 0.12 mg/L | 0.081 mg/L (4-day average) – Marine | Not Identified |
| 2/17/2006 | Zinc | 0.12 mg/L | 0.09 mg/L (1-hour average) – Marine | Not Identified |
| 1/31/2006 | Oil & Grease Sheen Observed | | Narrative | Drain #1 |
| 1/31/2006 | Turbidity/Cloudiness Observed | | Narrative | Drain #1 |
| 12/30/2005 | Oil & Grease Sheen Observed | | Narrative | Drains #2, #3, and #5 |
| 12/30/2005 | Turbidity/Cloudiness Observed | | Narrative | Drains #2, #3, and #5 |
| 12/30/2005 | Floating Material Observed | | Narrative | Drains #2, #3, and #5 |
| 2/16/2005 | pH | 6.1 | 6.5 – 8.5 | Not Identified |
| 2/16/2005 | Copper | 0.074 mg/L | 0.0031 mg/L (4-day average) – Marine | Not Identified |
| 2/16/2005 | Copper | 0.074 mg/L | 0.0048 mg/L (1-hour average) – Marine | Not Identified |
| 2/16/2005 | Zinc | 0.12 mg/L | 0.081 mg/L (4-day average) – Marine | Not Identified |
| 2/16/2005 | Zinc | 0.12 mg/L | 0.09 mg/L (1-hour average) – Marine | Not Identified |
| 2/14/2005 | Oil & Grease Sheen Observed | | Narrative | Drain #1 |
| 2/14/2005 | Turbidity/Cloudiness Observed | | Narrative | Drain #1 |
| 12/27/2004 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 12/27/2004 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |
| 12/27/2004 | Copper | 0.03 mg/L | 0.0031 mg/L (4-day average) – Marine | Drain #5 |
| 12/27/2004 | Copper | 0.03 mg/L | 0.0048 mg/L | Drain #5 |

Notice of Violation and Intent to File Suit

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 8 of 15

| | | | (1-hour average) – Marine | |
|---|---|---|---|---|
| 12/27/2004 | Lead | 0.0086 mg/L | 0.0081 mg/L (4-day average) – Marine | Drain #5 |
| 12/27/2004 | Zinc | 0.36 mg/L | 0.081 mg/L (4-day average) – Marine | Drain #5 |
| 12/27/2004 | Zinc | 0.36 mg/L | 0.09 mg/L (1-hour average) – Marine | Drain #5 |
| 11/10/2004 | Oil & Grease Sheen Observed | | Narrative | Drain #5 |
| 11/10/2004 | Turbidity/Cloudiness Observed | | Narrative | Drain #5 |

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit:

| Date | Parameter | Observed Concentration | Benchmark Value | Location (as identified by the Facility) |
|---|---|---|---|---|
| 11/25/2008 | TSS | 304 mg/L | 100 mg/L | Drain #5 |
| 11/25/2008 | Iron | 9.9 mg/L | 1.0 mg/L | Drain #5 |
| 11/25/2008 | Aluminum | 6.4 mg/L | 0.75 mg/L | Drain #5 |
| 11/25/2008 | Copper | 0.064 mg/L | 0.0636 mg/L | Drain #5 |
| 11/25/2008 | Zinc | 0.68 mg/L | 0.117 mg/L | Drain #5 |
| 3/26/2007 | TSS | 250 mg/L | 100 mg/L | Not Identified |
| 3/26/2007 | Specific Conductivity | 210 | 200 µmho/cm (proposed) | Not Identified |
| 3/26/2007 | Iron | 9.7 mg/L | 1.0 mg/L | Not Identified |
| 3/26/2007 | Aluminum | 8.5 mg/L | 0.75 mg/L | Not Identified |
| 3/26/2007 | Zinc | 1.4 mg/L | 0.117 mg/L | Not Identified |
| 2/17/2006 | TSS | 190 mg/L | 100 mg/L | Not Identified |
| 2/17/2006 | Oil & Grease | 17 mg/L | 15 mg/L | Not Identified |
| 2/17/2006 | Iron | 2 mg/L | 1.0 mg/L | Not Identified |
| 2/17/2006 | Aluminum | 1.6 mg/L | 0.75 mg/L | Not Identified |
| 2/17/2006 | Zinc | 0.12 mg/L | 0.117 mg/L | Not Identified |
| 2/17/2006 | COD | 150 mg/L | 120 mg/L | Not Identified |
| 2/16/2005 | Copper | 0.074 mg/L | 0.0636 mg/L | Not Identified |

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 9 of 15

| 2/16/2005 | Zinc | 0.12 mg/L | 0.117 mg/L | Not Identified |
|---|---|---|---|---|
| 12/27/2004 | TSS | 140 mg/L | 100 mg/L | Drain #5 |
| 12/27/2004 | Specific Conductivity | 220 | 200 µmho/cm (proposed) | Drain #5 |
| 12/27/2004 | Iron | 5.2 mg/L | 1.0 mg/L | Drain #5 |
| 12/27/2004 | Aluminum | 4.2 mg/L | 0.75 mg/L | Drain #5 |
| 12/27/2004 | Zinc | 0.36 mg/L | 0.117 mg/L | Drain #5 |
| 12/27/2004 | COD | 640 mg/L | 120 mg/L | Drain #5 |

CSPA's investigation, including its review of Tomra Pacific's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards, EPA's benchmark values, and the State Board's proposed benchmark for electrical conductivity, indicates that Tomra Pacific has not implemented BAT and BCT at the Facility for its discharges of TSS, pH, specific conductivity, iron, aluminum, lead, copper, zinc, COD, and other pollutants in violation of Effluent Limitation B(3) of the General Permit. Tomra Pacific was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, Tomra Pacific is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA also alleges that such violations have occurred and will occur on other rain dates, including every significant rain event that has occurred since at least November 20, 2004, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Tomra Pacific has discharged storm water containing impermissible levels of TSS, pH, specific conductivity, iron, aluminum, lead, copper, zinc, and COD in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Tomra Pacific is subject to penalties for violations of the General Permit and the Act since November 20, 2004.

**B.      *Failure to Sample and Analyze Storm Events and  Mandatory Parameters***

With some limited adjustments, facilities covered by the General Permit must sample two storm events per season from each of their storm water discharge locations. General Permit, Section B(5)(a). "Facility operators shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season." *Id*. "All storm water discharge locations shall be sampled." *Id*. "Facility

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 10 of 15

operators that do not collect samples from the first storm event of the wet season are still
required to collect samples from two other storm events of the wet season and shall explain in
the Annual Report why the first storm event was not sampled." *Id*.  Tomra Pacific failed to
sample a second storm event during each of the 2005-2006, 2006-2007, and 2008-2009 rainy
seasons, and failed to sample *any* storm events during the 2007-2008 rainy season, for a total of
five violations of the General Permit.  These violations are ongoing.  Consistent with the five-
year statute of limitations applicable to citizen enforcement actions brought pursuant to the
federal Clean Water Act, Tomra Pacific is subject to penalties for violations of the General
Permit and the Act since November 20, 2004.

Additionally, on information and belief, CSPA alleges that Tomra Pacific has failed to
collect the two required storm water samples from each and every storm water discharge location
in each of the last five years despite discharging storm water from its facility.  During the past
five years, Tomra Pacific has only sampled and analyzed storm water discharges from one
location at the Facility.  CSPA alleges that during both the 2007-2008 and 2008-2009 rainy
seasons, Tomra Pacific discharged storm water from at least five other locations.  CSPA further
alleges that during each of the 2004-2005, 2005-2006, and 2006-2007 rainy seasons, Tomra
Pacific discharged storm water from at least three other locations.  The failure to collect five
samples from two discharge locations for two rainy seasons and three samples from two
discharge locations for three rainy seasons results in thirty-eight distinct violations of the
General Permit.  These violations are ongoing.  Consistent with the five-year statute of
limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water
Act, Tomra Pacific is subject to penalties for violations of the General Permit and the Act since
November 20, 2004.

### C.   Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.

Section A and Provision E(2) of the General Industrial Storm Water Permit require
dischargers of storm water associated with industrial activity to develop, implement, and update
an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.
Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the
General Permit to continue following their existing SWPPP and implement any necessary
revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants
associated with industrial activities that may affect the quality of storm and non-storm water
discharges from the facility and identify and implement site-specific best management practices
("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and
authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must
include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must
include: a description of individuals and their responsibilities for developing and implementing
the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 11 of 15

water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

    The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

    CSPA's investigation of the conditions at the Facility as well as Tomra Pacific's Annual Reports indicate that Tomra Pacific has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Tomra Pacific has failed to evaluate the effectiveness of its BMPs, to implement structural BMPs, and to revise its SWPPP as necessary. Tomra Pacific has been in continuous violation of Section A and Provision E(2) of the General Permit every day since at least November 20, 2004, and will continue to be in violation every day that Tomra Pacific fails to prepare, implement, review, and update an effective SWPPP. Tomra Pacific is subject to penalties for violations of the Order and the Act occurring since November 20, 2004.

    **D.     Failure to Develop and Implement an Adequate Monitoring and Reporting Program**

    Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)). Section B(4)(c) requires visual observation records to note, among other things, the date of each monthly observation. Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season. Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event." Tomra Pacific failed to make monthly visual observations as required under Section B(4) of the General Permit in January 2004, March 2004, February 2006, and April 2006, for a total of four violations of the General Permit. Also in violation of Section B(4), Tomra Pacific recorded no observations or no rainfall in months during which rainfall occurred (*see* Attachment A: Rain Dates) in April, May, October, and November of 2005; May and December of 2006; January, February, October, and November of 2007; March and April of

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 12 of 15

2008; and February, March, April, and May of 2009, for a total of sixteen General Permit violations. Tomra Pacific failed to note the dates on its monthly visual observations as required by Section B(4)(c) of the General Permit in April, May, October, and November of 2005; May 2006; May 2008; and February, March, April and May of 2009, for a total of ten General Permit violations. These violations are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Tomra Pacific is subject to penalties for violations of the General Permit and the Act since November 20, 2004.

The above referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board. This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit. To the extent the storm water data collected by Tomra Pacific is not representative of the quality of the Facility's various storm water discharges, CSPA, on information and belief, alleges that the Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Tomra Pacific is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since November 20, 2004.

> **E.**     ***Failure to File True and Correct Annual Reports.***

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9) & (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) & (10) and B(14).

In addition, since 2004, Tomra Pacific and its agent, Francisco Minjavez, inaccurately certified in their Annual Reports that the Facility was in compliance with the General Permit. Consequently, Tomra Pacific has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Tomra Pacific failed to submit a complete or correct report and every time Tomra Pacific or its agent falsely purported to comply with the Act. Tomra Pacific is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since November 20, 2004.

## IV.    Persons Responsible for the Violations.

CSPA puts Tomra Pacific, Francisco Minjavez, and Randall Gusikoski on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 13 of 15

Tomra Pacific, Francisco Minjavez, and Randall Gusikoski on notice that it intends to include those persons in this action.

**V.     Name and Address of Noticing Party.**

Our name, address, and contact information is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067
Fax (209) 464-1028
E-Mail: deltakeep@aol.com

**VI.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Michael R. Lozeau                         Andrew L. Packard
David A. Zizmor                           Law Offices of Andrew L. Packard
Lozeau Drury LLP                          319 Pleasant Street
1516 Oak Street, Suite 216                Petaluma, California 94952
Alameda, California 94501                 Tel. (707) 763-7227
Tel. (510) 749-9102                       andrew@packardlawoffices.com
michael@lozeaudrury.com
david@lozeaudrury.com

**VII.     Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4; 73 FR 75340) each separate violation of the Act subjects Tomra Pacific to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Tomra

Randall Gusikoski
Tomra Pacific, Inc.
November 20, 2009
Page 14 of 15

Pacific and its agents for the above-referenced violations upon the expiration of the 60-day
notice period.  However, during the 60-day notice period, we would be willing to discuss
effective remedies for the violations noted in this letter.  If you wish to pursue such discussions
in the absence of litigation, we suggest that you initiate those discussions within the next 20 days
so that they may be completed before the end of the 60-day notice period.  We do not intend to
delay the filing of a complaint in federal court if discussions are continuing when that period
ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## <u>SERVICE LIST</u>

CSC Lawyers Incorporating Service [Registered Agent]
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dorothy R. Rice, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Eric Holder, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Laura Yoshii, Acting Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

**ATTACHMENT A**

Rain Dates, Tomra Pacific, Fremont, California

| | | |
|---|---|---|
| November 27, 2004 | January 26, 2005 | October 27, 2005 |
| November 28, 2004 | January 27, 2005 | October 28, 2005 |
| December 1, 2004 | January 28, 2005 | October 29, 2005 |
| December 2, 2004 | January 29, 2005 | November 4, 2005 |
| December 3, 2004 | February 7, 2005 | November 8, 2005 |
| December 4, 2004 | February 8, 2005 | November 10, 2005 |
| December 5, 2004 | February 12, 2005 | November 25, 2005 |
| December 6, 2004 | February 15, 2005 | November 26, 2005 |
| December 7, 2004 | February 16, 2005 | November 29, 2005 |
| December 8, 2004 | February 18, 2005 | November 30, 2005 |
| December 9, 2004 | February 19, 2005 | December 1, 2005 |
| December 10, 2004 | February 20, 2005 | December 2, 2005 |
| December 11, 2004 | February 21, 2005 | December 8, 2005 |
| December 12, 2004 | February 22, 2005 | December 18, 2005 |
| December 13, 2004 | February 27, 2005 | December 19, 2005 |
| December 14, 2004 | March 2, 2005 | December 22, 2005 |
| December 15, 2004 | March 4, 2005 | December 23, 2005 |
| December 16, 2004 | March 5, 2005 | December 26, 2005 |
| December 17, 2004 | March 19, 2005 | December 28, 2005 |
| December 18, 2004 | March 20, 2005 | December 29, 2005 |
| December 19, 2004 | March 21, 2005 | December 30, 2005 |
| December 20, 2004 | March 22, 2005 | December 31, 2005 |
| December 21, 2004 | March 23, 2005 | January 1, 2006 |
| December 22, 2004 | March 24, 2005 | January 2, 2006 |
| December 23, 2004 | March 28, 2005 | January 3, 2006 |
| December 24, 2004 | March 29, 2005 | January 4, 2006 |
| December 25, 2004 | April 4, 2005 | January 7, 2006 |
| December 26, 2004 | April 7, 2005 | January 11, 2006 |
| December 27, 2004 | April 8, 2005 | January 14, 2006 |
| December 28, 2004 | April 9, 2005 | January 15, 2006 |
| December 29, 2004 | April 23, 2005 | January 18, 2006 |
| December 30, 2004 | April 28, 2005 | January 19, 2006 |
| December 31, 2004 | April 29, 2005 | January 21, 2006 |
| January 1, 2005 | May 5, 2005 | January 22, 2006 |
| January 2, 2005 | May 6, 2005 | January 27, 2006 |
| January 3, 2005 | May 8, 2005 | January 29, 2006 |
| January 4, 2005 | May 9, 2005 | January 31, 2006 |
| January 5, 2005 | May 10, 2005 | February 2, 2006 |
| January 6, 2005 | May 19, 2005 | February 4, 2006 |
| January 7, 2005 | May 20, 2005 | February 18, 2006 |
| January 8, 2005 | June 8, 2005 | February 27, 2006 |
| January 9, 2005 | June 9, 2005 | February 28, 2006 |
| January 10, 2005 | June 17, 2005 | March 1, 2006 |
| January 11, 2005 | September 21, 2005 | March 2, 2006 |
| January 12, 2005 | October 15, 2005 | March 3, 2006 |

**ATTACHMENT A**

Rain Dates, Tomra Pacific, Inc., Fremont, California

| | | |
|---|---|---|
| March 4, 2006 | November 12, 2006 | September 23, 2007 |
| March 6, 2006 | November 13, 2006 | October 10, 2007 |
| March 7, 2006 | November 14, 2006 | October 12, 2007 |
| March 8, 2006 | November 23, 2006 | October 13, 2007 |
| March 9, 2006 | November 27, 2006 | October 16, 2007 |
| March 10, 2006 | December 9, 2006 | October 17, 2007 |
| March 11, 2006 | December 10, 2006 | October 18, 2007 |
| March 12, 2006 | December 11, 2006 | October 20, 2007 |
| March 13, 2006 | December 12, 2006 | October 30, 2007 |
| March 14, 2006 | December 13, 2006 | November 11, 2007 |
| March 15, 2006 | December 14, 2006 | December 4, 2007 |
| March 17, 2006 | December 15, 2006 | December 5, 2007 |
| March 18, 2006 | December 22, 2006 | December 7, 2007 |
| March 21, 2006 | December 27, 2006 | December 17, 2007 |
| March 25, 2006 | January 4, 2007 | December 18, 2007 |
| March 26, 2006 | January 5, 2007 | December 19, 2007 |
| March 28, 2006 | January 17, 2007 | December 20, 2007 |
| March 29, 2006 | January 27, 2007 | December 26, 2007 |
| March 30, 2006 | January 28, 2007 | December 28, 2007 |
| March 31, 2006 | January 29, 2007 | December 29, 2007 |
| April 1, 2006 | February 9, 2007 | January 4, 2008 |
| April 3, 2006 | February 10, 2007 | January 5, 2008 |
| April 4, 2006 | February 11, 2007 | January 6, 2008 |
| April 5, 2006 | February 13, 2007 | January 7, 2008 |
| April 6, 2006 | February 22, 2007 | January 9, 2008 |
| April 8, 2006 | February 23, 2007 | January 10, 2008 |
| April 10, 2006 | February 25, 2007 | January 11, 2008 |
| April 11, 2006 | February 26, 2007 | January 21, 2008 |
| April 12, 2006 | February 27, 2007 | January 22, 2008 |
| April 13, 2006 | February 28, 2007 | January 23, 2008 |
| April 15, 2006 | March 21, 2007 | January 24, 2008 |
| April 16, 2006 | March 27, 2007 | January 25, 2008 |
| April 17, 2006 | April 11, 2007 | January 26, 2008 |
| May 20, 2006 | April 12, 2007 | January 27, 2008 |
| May 22, 2006 | April 14, 2007 | January 28, 2008 |
| October 5, 2006 | April 15, 2007 | January 29, 2008 |
| October 6, 2006 | April 20, 2007 | January 30, 2008 |
| November 2, 2006 | April 22, 2007 | February 1, 2008 |
| November 3, 2006 | May 2, 2007 | February 3, 2008 |
| November 4, 2006 | May 4, 2007 | February 4, 2008 |
| November 8, 2006 | May 5, 2007 | February 20, 2008 |
| November 11, 2006 | September 22, 2007 | February 21, 2008 |

## ATTACHMENT A

### Rain Dates, Tomra Pacific, Inc., Fremont, California

| | | |
|---|---|---|
| February 22, 2008 | February 17, 2009 | October 9, 2009 |
| February 23, 2008 | February 18, 2009 | October 10, 2009 |
| February 24, 2008 | February 22, 2009 | October 11, 2009 |
| February 25, 2008 | February 23, 2009 | October 12, 2009 |
| March 13, 2008 | February 24, 2009 | October 13, 2009 |
| March 15, 2008 | February 25, 2009 | October 14, 2009 |
| March 29, 2008 | February 26, 2009 | October 15, 2009 |
| April 23, 2008 | March 1, 2009 | October 16, 2009 |
| October 4, 2008 | March 2, 2009 | October 17, 2009 |
| October 31, 2008 | March 3, 2009 | October 19, 2009 |
| November 1, 2008 | March 4, 2009 | October 20, 2009 |
| November 2, 2008 | March 5, 2009 | October 21, 2009 |
| November 4, 2008 | March 22, 2009 | October 22, 2009 |
| November 9, 2008 | April 8, 2009 | October 23, 2009 |
| November 27, 2008 | April 10, 2009 | October 24, 2009 |
| December 13, 2008 | May 2, 2009 | October 25, 2009 |
| December 15, 2008 | May 3, 2009 | October 26, 2009 |
| December 16, 2008 | May 5, 2009 | October 27, 2009 |
| December 17, 2008 | June 2, 2009 | October 28, 2009 |
| December 19, 2008 | June 13, 2009 | October 29, 2009 |
| December 21, 2008 | July 2, 2009 | October 30, 2009 |
| December 22, 2008 | August 16, 2009 | October 31, 2009 |
| December 23, 2008 | August 18, 2009 | November 4, 2009 |
| December 24, 2008 | August 19, 2009 | November 5, 2009 |
| December 25, 2008 | August 20, 2009 | November 6, 2009 |
| December 26, 2008 | September 9, 2009 | November 7, 2009 |
| January 3, 2009 | September 17, 2009 | November 8, 2009 |
| January 6, 2009 | September 18, 2009 | November 9, 2009 |
| January 22, 2009 | September 19, 2009 | November 10, 2009 |
| January 23, 2009 | September 23, 2009 | November 11, 2009 |
| January 24, 2009 | September 24, 2009 | November 12, 2009 |
| January 26, 2009 | September 25, 2009 | November 13, 2009 |
| February 5, 2009 | September 26, 2009 | November 14, 2009 |
| February 6, 2009 | September 27, 2009 | November 15, 2009 |
| February 7, 2009 | September 29, 2009 | November 16, 2009 |
| February 9, 2009 | September 30, 2009 | November 17, 2009 |
| February 11, 2009 | October 1, 2009 | November 18, 2009 |
| February 12, 2009 | October 2, 2009 | |
| February 13, 2009 | October 3, 2009 | |
| February 14, 2009 | October 5, 2009 | |
| February 15, 2009 | October 7, 2009 | |
| February 16, 2009 | October 8, 2009 | |

# EXHIBIT 3



Revel
Environmental
Manufacturing

search

Register now!    login

| Home | Products | Services | About REM | Contact Us | News & Resources | FAQ |

Catch Basin
Filters
    Triton Filter
    Geo-Trap
Curb Intlet Filters
Drop Inlet
Trench Drain
Filters
Curb Protectors
Erosion Control
    Weighted
    Walnut Wattles
Drain and Curb
Markers
Spill Control
Filter Accessories
    Filter Media
    Filter Inserts

Home » Products » TRITON Filter

# TRITON Filter

**TRITON FILTER CATCH BASIN INSERT**

 Print brochure

REM has developed the TRITON Catch Basin Insert to help eliminate hydrocarbons and other
contaminants such as antifreeze, metals, sand, silt and litter from storm water runoff.

The TRITON is designed to be inserted below the grate of storm drain inlets.



(click for larger view)

## Product Specification

Non-reactive High Density polyethylene plastic
construction.

Round, Square, Rectangular and Custom models.

Filter Media Cartridges available for the removal of
Hydrocarbons, Metals Antifreeze, Sand, Silt and Litter.

Media is non hazardous, per EPA and OSHA standards.

Easy servicing, removable Filter Media Cartridge allows for
quick servicing.

Patented design with high nominal flow and high overflow
capacities.

Easy to install in new and existing catch basins.

Maintenance contracts available.

Servicing of filters on a regular basis is a requirement to
meet most local and state BMP's.

Meets Best Available Technology for use in Storm Water
BMP (Best Management Practices).

Media Cartridges can be interchanged with GEO-TRAP
series as site conditions change.

## Related Links

Product Brochure »

View MSDS of Filter Media »

# EXHIBIT 3

Case 3:10-cv-00701-BZ   Document 21   Filed 01/31/11   Page 68 of 72

## Standard Dimensions



|        | A     | B    | C    | D    | E     | F    | G     | Inserts |
|--------|-------|------|------|------|-------|------|-------|---------|
| TR1212 | 13    | 13   | 11   | 11   | 6.75  | 3.5  | 5.5   | 1       |
| TR1616 | 16.5  | 16.5 | 13.5 | 13.5 | 10.25 | 7.25 | 6.5   | 1       |
| TR1818 | 19    | 19   | 13.5 | 13.5 | 10.5  | 7.25 | 6.5   | 1       |
| TR1824 | 17.5  | 24   | 15   | 21   | 10.5  | 7.25 | 6.5   | 1       |
| TR18RD | 18    |      | 11   |      | 6.75  | 3.5  | 6.75  | 1       |
| TR2024 | 19.5  | 23.5 | 17.5 | 21.5 | 10.5  | 7.25 | 6.5   | 1       |
| TR24SR | 23.75 | 26.5 | 21   | 21   | 14    | 11   | 11.5  | 1       |
| TR2436 | 27    | 38   | 17   | 30   | 10.25 | 7.25 | 9     | 2       |
| TR2448 | 23.25 | 52   | 21   | 46   | 14    | 11   | 11.5  | 2       |
| TR24RD | 24.5  |      | 21   |      | 14    | 11   | 11.5  | 1       |
| TR3030 | 33    | 29   | 21   | 21   | 14    | 11   | 11.5  | 1       |
| TR3636 | 40    | 40   | 34   | 34   | 10.25 | 7.25 | 9     | 4       |
| TR4848 | 52    | 52   | 46   | 46   | 14    | 11   | 11.5  | 4       |

## Notes

1. All dimensions are in inches.
2. Dimension (G) is filter depth.
3. Units are constructed from High Density Polyethylene plastic with U.V. inhibitors.
4. Media Cartridges can be interchanged with GEO-TRAP series as site conditions change.
5. Low profile filters are also available for shallow catch basins.
6. **Custom sizes are available to fit most applications. Please call a distributor near you for details.**
7. Patent No. 6,217,757.



Home   Products   Services   About REM   Contact Us   News & Resources   FAQ   Account Help

Copyright © 2002-2008 REM Inc., All Rights Reserved

# T R I T O N  F I L T E R™



## Product
### Specification

# CATCH BASIN FILTER INSERT



MODEL TR24SR

## THE TRITON FILTER

- Non-reactive High Density Poly-ethylene (HDPE) plastic construction, with U.V. inhibitors.
- Round, Square, Rectangular, Low Profile and Custom models.
- Dual Stage and Dual Capacity Filters are also available.
- Quick and easy servicing made available by replaceable Media-Paks.
- Filter Media-Pak available for the removal of hydrocarbons, metals, sand, silt, and litter.
- Disposable Filter Media-Pak is constructed from durable geotextile, polyproplene fabric.
- Media-Pak can be interchanged with Geo-Trap series as site conditions change.
- Media is nonhazardous, per EPA and OSHA standards.
- Patented design with high nominal flow and high overflow capacities.
- Easy to install in new and existing catch basins.
- Meets Best Available Technology (BAT) for use in Stormwater Best Management Practices (BMP).
- Maintenance contracts, including recycling of all spent absorbents are available.
- Servicing of filters on a regular basis is a requirement to meet most local and state BMP's.

## *TRITON CATCH BASIN FILTER INSERT*

REM has developed the TRITON Catch Basin Insert to help eliminate hydrocarbons and other contaminants such as metals, sand, silt and litter from stormwater runoff.

The TRITON is designed to be inserted below the grate of storm drain inlets.

**Patent No. 6,217,757**

## REM - HELPING KEEP YOUR WATERWAYS CLEAN

*The most recent National Water Quality Inventory reports that runoff from urban areas is the leading source of impairments to surveyed estuaries and the third largest source of water quality impairments to surveyed lakes. In addition, population and development trends indicate that by 2010 more than half of the Nation will live in coastal towns and cities. Runoff from these rapidly growing urban areas will continue to degrade coastal waters.[1]*

[1]Environmental Protection Agency's Office of Water EPA841–F–96–004G

## Revel Environmental Manufacturing, Inc.
www.remfilters.com
888-526-4763

MADE IN

U S A

# TRITON FILTER™ CATCH BASIN INSERT



TRITON MEDIA CARTRIDGE



DIMENSIONAL SPECIFICATIONS

## STANDARD DIMENSIONS (IN INCHES)

| | A* | B* | C | D | E | F | G* | CARTRIDGES |
|---|---|---|---|---|---|---|---|---|
| TR1212 | 13 | 13 | 11 | 11 | 6.75 | 3.75 | 5.5 | 1 |
| TR1212RD | 13 DIA. | | 11 DIA. | | 6.75 | 3.75 | 5.5 | 1 |
| TR1616 | 18 | 18 | 14 | 14 | 6.75 | 3.75 | 10.5 | 1 |
| TR1818 | 20 | 20 | 17 | 17 | 10.5 | 7.25 | 10.5 | 1 |
| TR18RD | 20 DIA. | | 16.5 DIA. | | 6.75 | 3.75 | 10.5 | 1 |
| TR1824 | 19 | 25 | 17 | 17 | 10.5 | 7.25 | 10.5 | 1 |
| TR2024 | 20 | 24 | 17 | 17 | 10.5 | 7.25 | 10.5 | 1 |
| TR24SR | 26 | 26 | 21 | 21 | 14 | 11 | 13 | 1 |
| TR24RD | 26 DIA. | | 21 DIA. | | 14 | 11 | 13 | 1 |
| TR2436 | 26 | 38 | 17 | 30 | 10.5 | 7.25 | 10.5 | 2 |
| TR3030 | 33 | 33 | 21 | 21 | 14 | 11 | 13 | 1 |
| TR36SR | 40 | 40 | 33 | 33 | 14 | 11 | 22 | 1 TALL |
| TR36RD | 40 DIA. | | 30 DIA. | | 14 | 11 | 22 | 1 TALL |
| TR2448 | 26 | 52 | 21 | 42 | 14 | 11 | 13 | 2 |
| TR4848 | 52 | 52 | 42 | 42 | 24 | 20 | 22 | 1 TALL |

\* Note:  Dimension "G" is filter depth.
Dimensions "A" and "B" can be adjusted to suit varying sizes of catch basins.

 

**NOTES:**

1. All dimensions are in inches.
2. Units are constructed from High Density Polyethylene Plastic with U.V. inhibitors.
3. Media Cartridges can be interchanged with Geo-Trap series as site conditions change.
4. Low profile filters are also available for shallow catch basins.
5. Custom sizes are available to fit most applications. Please call a distributor near you for details.
6. Optional TDG series Trash & Debris Guard also available.
7. Dual stage and dual capacity filters also available.



**Revel Environmental Manufacturing Inc.**
sales@remfilters.com   (888) 526-4736   Lic. No. 857410

Northern California
960-B Detroit Avenue
Concord, California 94518
P: (925) 676-4736
F: (925) 676-8676
www.remfilters.com

Southern California
2110 South Grand Avenue
Santa Ana, California  92705
P: (714) 557-2676
F: (714) 557-2679

**Distributed By:**



**CleanWay** Environmental Partners, Inc.
PO Box 30087
10620 NE Marx Street
Portland, Oregon  97294
Toll free 800-723-1373
Tel 503-280-5102
Fax 503-288-3658





## MetalZorb™
Treated Sponge Product for the Removal of Heavy Metal Contaminants

### General Properties

Treated Sponge Products Type M and M-TU have selective affinity for heavy metals in cationic and anionic states in aqueous solution. MetalZorb functions by forming coordination complexes preferentially with ions of the transition group Heavy Metals, namely metals classified in groups IB through VIIIB of the Periodic Table of Elements; and generally characterized as having incomplete inner rings of electrons or otherwise capable of existing in more than one valence state.

By comparison, metals such as calcium, magnesium and aluminum, having complete inner rings of electors and single valence states, show poor affinity for the treated sponge. MetalZorb provides ligand sites that surround the metal and form a coordination complex. The order of its affinity for metals is influenced by solution parameters such as pH, temperature and total ionic content. However, the following affinity sequence of some representative ions can generally be expected to be:

$$Au^{+++} > UO_4^{-2} > Cd^{++} > Hg^{++} > Au(CN)^{-2} > Cu^{++} > Pb^{++} > VO_4^{-3} > MoO_4^{-2} > Zn^{++}$$
$$> Cr^{+++} > CrO_4^{-2} > Ni^{++} > SeO_4^{-2} > AsO_4^{-3} > Co^{++} > Mn^{++} > Fe^{+++} > Ag^+ > Al^{+++}$$
$$> Mg^{++} > K^+$$

When employed as a stationary bed in a tank or column through which an aqueous stream flows, absorption bands are produced generally in accordance with the affinity sequence. In certain situations, strongly absorbed species will displace less strongly absorbed species. This characteristic may be employed to separate ions. When utilized in an upward flow fluidized bed or in rotating drums, simultaneous absorption of a number of ionic species will occur in amounts relative to the initial concentration and affinity sequence.

At saturation, the MetalZorb will contain between 6% and 15% (dry weight) of absorbed ions, depending on the affinity of the sponge product for the ion and its molecular weight. This represents an absorption capacity of about 1.0 – 2.0 molar equivalent of absorbed ion/dry gram of sponge product. The presence of commonly abundant innocuous ions such as $Na^+$, $K^+$, $Ca^{++}$, $Mg^{++}$, $Al^{+++}$, $Cl^-$, $SO4^{--}$ will not adversely affect the sponge's absorption capacity.

**Applications**

These treated sponge absorbents are highly effective for removing toxic species in low ppm and ppb concentrations from industrial wastewater, groundwater, stormwater, landfill leachate, municipal process streams and drainage waters. They are particularly useful in remediating waters that contain less than 20 ppm of targeted species, especially where treated effluent concentrations below 1 ppb are sought. Absorbent sponge is typically employed as a polishing operation following an upstream treatment such as a precipitation process. MetalZorb is uniquely capable of absorbing metals such as mercury, lead, nickel and cadmium, which are chelated by EDTA or other synthetic or naturally occurring chelating agents.

For applications where the solutions are high temperature or exposed to extreme pH ranges, please contact CleanWay for technical support.

**Statement of Non-Warranty**

All data, statements and recommendations in this publication are based on the best information available and believed to be reliable. CleanWay assumes no obligation or liability, and makes no express or implied warranty with regard to the data, statements and recommendation given or applications covered or results obtained. All information is given and accepted at the user's risk. Although no adverse physiological effects have been observed in the handling of the treated sponge product, users assume all risk of use and handling. No statement shall be taken as a recommendation of action or use without independent investigation. Users are reminded to practice such safety precautions as may be indicated in the particular circumstances to protect health and property.

**Patents issued and pending.**

© 2010 CleanWay Environmental Partners, Inc.